UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY D. AMAKER,

                            Plaintiff,

-against-

K. GERBING; P. EARLY; S. ROBERTS; S.
BENNETT; P. WOLFF; DR. GUSMAN; C.O.
J. RIO; C.O. BARBER; LT. JOHN DOE; D.
VENETOZZI,

                            Defendants.

17-CV-3520 (LLS)

ORDER TO AMEND

LOUIS L. STANTON, United States District Judge:

    Plaintiff filed this complaint while he was incarcerated at Bare Hill Correctional Facility

("Bare Hill"), in the custody of the New York State Department of Corrections and Community

Supervision (DOCCS), asserting claims that arose at Bare Hill and at Otisville Correctional

Facility.[1] By order dated October 2, 2019, the Court severed the claims in Plaintiff's complaint

arising at Bare Hill and transferred those claims to the United States District Court for the

Northern District of New York.

    For the reasons set forth below, the Court grants Plaintiff leave to amend his complaint.

**STANDARD OF REVIEW**

    The Prison Litigation Reform Act (PLRA) requires federal courts to screen complaints

brought by prisoners who seek relief against a governmental entity or an officer or employee of a

---

[1] Because Plaintiff is barred from filing any new action *in forma pauperis* (IFP) while a
prisoner, *Amaker v. Annucci*, ECF 7:14-CV-9692, 48 (KMK) (S.D.N.Y. Sept. 30, 2016), the
Court denied Plaintiff's IFP application and dismissed the complaint without prejudice to
Plaintiff's refiling it. Plaintiff thereafter paid the $400.00 in filing fees, and he has been released
from DOCCS custody. On August 26, 2019, the Court reopened this action.

governmental entity.[2] See 28 U.S.C. § 1915A(a). The court must dismiss a prisoner's *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The court must also dismiss a complaint if the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

## BACKGROUND

The following allegations are from Plaintiff Anthony Amaker's complaint. When Plaintiff was incarcerated at Green Haven Correctional Facility, Dr. Gordin provided medical care for Plaintiff. Dr. Gordin "always renewed [Plaintiff's] permits" for a bus pass and/or low bunk permit for various medical conditions. (Compl. at 3.) However, Dr. Gordin apparently "passed away of a heart attack" without having ordered knee braces for Plaintiff before his transfer to Otisville Correctional Facility ("Otisville"). (*Id.*)

On March 5, 2015, Plaintiff arrived at Otisville, and had a medical visit with Dr. Ferdous. Plaintiff eventually was issued a bus pass and low bunk permit at Otisville because of a "condition in [his] right and left knees, lower back, herniated discs, and sciatica." (*Id.*) A few months after Plaintiff's arrival, he was moved to the north side of Otisville, to dorm 112; in that location, Plaintiff had a "mile long walk to the mess hall" with many hills. On January 20, 2016, Plaintiff saw Dr. Gusman at Otisville, and Dr. Gusman directed the nurse to issue Plaintiff a six-month bus pass.

---

[2] Because Plaintiff filed this complaint while a prisoner, the provisions of the PLRA apply to this action. *See Gibson v. City Municipality of N.Y.*, 692 F.3d 198, 201 (2d Cir. 2012) ("[T]he relevant time at which a person must be 'a prisoner' within the meaning of the PLRA in order for the Act's restrictions to apply is 'the moment the plaintiff files his complaint.'").

The "Executive Team" at Otisville, including Superintendent K. Gerbing, Deputy Superintendents P. Early, S. Roberts, and S. Bennett, "were thinking of several plans to reduce the [number] of bus passes giv[en] out by the doctors" and "started telling [Doctor] Gusman to limit the areas which the bus could take those in need of the bus." (*Id.* at 4.) As a result, on March 11, 2016, Dr. Gusman began limiting locations to which prisoners could get a bus pass. This "allowed Dr. Gusman to discriminate against mainly black and hispanic prisoners in limiting the bus passes." (*Id.*)

On March 11, 2016, Correction Officer K. Barber told Plaintiff that she had checked his file and his bus pass was "no good." (*Id.* at 7.) On March 16, 2016, Plaintiff filed a grievance and submitted a form request for a "reasonable accommodation for inmates with disabilities, which went directly to Ms. S. Bennett." (*Id.*) At some point thereafter, Plaintiff was again "called to the clinic and shown the application for reasonable accommodation, which was filled out by Ms. Bennett." (*Id.* at 5.)

Dr. Gusman called Plaintiff to the clinic and stated, "I am limit[ing] your bus pass [to] mess hall and clinic only, and if you do not want this[,] then you will be moved to the South[,] [where] you will only be given a bus pass for the visit[ing] room and commissary." (*Id.*) On March 25, 2016, Dr. Gusman "made a determination . . . to move [Plaintiff] to the South side of the compound," without doing "any further medical examination or evaluation." (*Id.*)[3] As a result

_____

[3] Plaintiff cites language that may be from the accommodation request application, which states: "A medical examination may be necessary to verify the existence of a disability that is not obvious, or to verify the severity of the limitations. If previous medical verification exists, subsequent reexamination is not necessary with every new request for a reasonable accommodation unless it appears the inmate's condition has [changed] or a question exists regarding the appropriateness of the accommodation. If further medical examination or assessment is required, a decision regarding the accommodation will be made after medical verification is obtained." (Compl. at 5.)

of the housing change, Plaintiff lost the privilege of having a two-person cell, even though he was not supposed to be "subjected to removal unless [he] violated a provision of the policy." (*Id.* at 9.)

The day that he was moved, Plaintiff had chest pain and was treated for high blood pressure at the Orange County Regional Medical Center. (*Id.* at 6.) When Plaintiff returned to Otisville on the evening of March 29, 2016, Correction Officer J. Rio "came to get [Plaintiff] in a van. He immediately told [Plaintiff], 'You have too much legal property.'" (*Id.*) Plaintiff responded that he had a court order allowing him to have six "draft bags" of legal property. Plaintiff eventually returned to the dorm without his property but several hours later was told to pick up his property; Plaintiff took the bus back to retrieve his property.

The following day, Plaintiff "was called for a misbehavior report[,] where C.O. J. Rio set [Plaintiff] up in retaliation for having legal property." (*Id.* at 6.) Plaintiff was eventually able to demonstrate that Rio did not inventory the property on March 25, 2016; instead, Rio inventoried the property on March 29, 2016, which Plaintiff states (1) violates DOCCS policy on temporary storage; and (2) "prove[s] a set up by C.O. Rio." (*Id.* at 7.) Plaintiff filed a "claim against missing property because the abuse of C.O. J. Rio retaliation against [Plaintiff] speaking out about [Plaintiff's legal property]." (*Id.*)

In April 2016, Plaintiff was elected to the inmate liaison committee for 123 Dorm. As of April 27, 2016, Plaintiff was still unable to use the bus pass for "religious services, commissary, visit room and package room." (*Id.*) Correction Officer Barber told Plaintiff that she "checked with a nurse and lieutenant and was told [that his] permit for six months was no good and not a bus pass." (*Id.*) Plaintiff states that before he was moved, Dr. Gusman had given him a bus pass

to travel to the mess hall and clinic but Plaintiff's new housing at 123 dorm was "within a very short distance" of those locations and he was "not taking the bus" there. (*Id.*)

On April 27, 2016, Dr. Gusman saw Plaintiff and issued him a limited bus pass, allowing Plaintiff to use the bus to travel for religious services, and to the law library, visiting room, and package room. Plaintiff did not receive a bus pass for "work program and commissary." (*Id.* at 8.) Plaintiff alleges that "white hispanic and white prisoners . . . were allowed to continue on unlimited bus passes, and they were not made to move from the North side to the South side dormitories." (*Id.*) That same afternoon, Correction Officer Watts asked Plaintiff for his old bus pass. Plaintiff explained that he just received a new bus pass, which was in his locker. Plaintiff later spoke to Watts again about his bus pass, and she told him that she had returned his pass to the clinic because an unidentified person had called her and asked that Plaintiff's old pass be returned. (*Id.*)

Plaintiff then went to the medication window and spoke with Nurse Peter Wolff. Nurse Wolff explained that Correction Officer Barber had indicated that Plaintiff was "trying to use an old bus pass to get on the bus." (*Id.*) Nurse Wolff "attempt[ed] to make [Plaintiff] wait and started yelling [at Plaintiff] to sit down" in order to "intimidate [Plaintiff[ and stop [him from] going to sick call to report him for taking the bus pass." (*Id.*) Nurse Wolff told Plaintiff that he was "giving [him] a direct order to sit down." (*Id.*) Another inmate urged Plaintiff to sit down, which he did. (*Id.* at 10.) But Plaintiff then "got up to speak to C.O. Figueroa[, who] told [Plaintiff] to sit down and wait to speak to the sergeant." (*Id.*) When Sergeant Mendez came out, Plaintiff explained what had happened, and Mendez told Plaintiff to return to the dorm. After Plaintiff was back in his dorm getting ready for class, he was notified that he "was placed on cube confinement per Sgt. Mendez." (*Id.*)

Deputy Superintendent P. Early came to Plaintiff's dorm early the next morning, and Plaintiff explained his story. Early told Plaintiff to inform Nurse Murray when Plaintiff returned from his medical trip that Early had said to give Plaintiff a copy of his bus pass. Plaintiff received notification the following day of the misbehavior report and the fact that Deputy Superintendent Early had "taken [him] off cube confinement." (*Id.*)

On May 12, 2016, Plaintiff had a Tier III disciplinary proceeding. Deputy Superintendent Bennett, who acted as the hearing officer, knew that Plaintiff had filed a grievance about Nurse Wolff and Correction Officer Barber's actions and knew about his complaint that black prisoners were being denied bus passes. Bennett "did not want to hear" Plaintiff's retaliation defense and "kept cutting off [his] defense." (*Id.* at 11.) Even though Nurse Wolff indicated that Dr. Gusman told him to retrieve Plaintiff's "old" bus pass, Bennett would not allow Plaintiff to call Dr. Gusman or Sergeant Mendez as witnesses. Bennett found Plaintiff guilty of an unspecified charge (possibly of disobeying Nurse Wolff's direct order to sit down, though this is unclear). The penalty of 60 days in the Segregated Housing Unit (SHU) that Bennett imposed on Plaintiff was reduced to 45 days. Plaintiff contends that Bennett was biased and found him guilty because Plaintiff had grieved Bennett's denial of his request for disability accommodations. Plaintiff also argues that black prisoners were statistically more like to receive SHU disciplinary punishment than other prisoners and that Bennett's decision therefore violated the settlement in *People v. Annucci*.[4]

Plaintiff appealed the disciplinary determination to D. Venetozzi, on the ground that he was denied witnesses and documents, but the appeal was denied. Plaintiff then learned that

---

[4] Plaintiff does not include any case citation. The Court assumes that the case Plaintiff references is about racial disparities in SHU punishment.

Deputy Superintendent Bennett had been involved in Plaintiff's bus pass investigation, and he sought reconsideration of the denial of his appeal of the disciplinary determination, arguing that Bennett was not an impartial hearing officer because of her involvement in that investigation. (*Id.* at 12.) It appears that reconsideration of the denial of his appeal was denied.

Plaintiff was transferred to Ulster Correctional Facility, where he spent two weeks "without his legal property." (*Id.*) Plaintiff was next transferred to Fishkill Correctional Facility in Sullivan County, where he had "limited access to the law library, writing supplies, hygiene supplies, recreation, commissary phones. Limited library access, no program[s] [and] limited medical treatment." (*Id.* at 13.) Plaintiff was moved to different cells "at least five times," despite his "back, legs and heart problems." (*Id.*) Plaintiff had been waiting for new contact lenses since May 2016. When the eye doctor arrived at Fishkill Correctional Facility on an unspecified date, the doctor was unaware of this "and therefore he did not bring the new prescription." On June 30, 2016, Plaintiff was transferred from Fishkill to Bare Hill.[5]

## DISCUSSION

### A.     Equal Protection

Plaintiff sues the "Executive Team," including Defendants Gerbing, Early, Roberts, and Bennett for "thinking of several plans to reduce the amount of bus passes give[n] out by the doctors." (Compl. at 4.) They allegedly told "Dr. Gusman to limit the bus passes" and the "areas [to] which the bus could take those in need." (*Id.*) Plaintiff further alleges that the directive to limit bus passes "allowed Dr. Gusman to discriminate against mainly black and Hispanic prisoners in limiting the bus passes." (*Id.*) The Court construes these allegations as claims under

---

[5] On October 2, 2019, the Court directed the Clerk of Court to transfer Plaintiff's claims arising at Bare Hill to the United States District Court for the Northern District of New York.

42 U.S.C. § 1983 that the "Executive Team" Defendants discriminated against Plaintiff because of his disability and Dr. Gusman discriminated against Plaintiff because of his race.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). As a general rule, the equal protection guarantee of the Constitution is satisfied when the government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest. *See Heller v. Doe*, 509 U.S. 312, 320 (1993).

1.     Discrimination Based on Disability

Disability is not a protected class under the Equal Protection Clause and therefore receives rational basis review. *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001); *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 109 (2d Cir. 2001). Rational basis review is highly deferential toward the government, whose actions are considered presumptively rational and a classification must be upheld if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2d Cir. 2008) (citation omitted). The rational basis need not be articulated at the time the discriminatory classification or action occurs; the burden is ultimately on the plaintiff to negate "every conceivable basis which might support" the state's action. *Price v. New York State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008).

Plaintiff's allegations that the Executive Team told "Dr. Gusman to limit the bus passes" and the "areas [to] which the bus could take those in need" are insufficient to state a claim for disability discrimination in violation of the Equal Protection Clause. On its face, a policy of limiting bus passes to essential locations appears rationally related to the government's legitimate

interests. Plaintiff alleges that the policy was applied to him to relocate him to a dorm near essential daily services, including the mess hall, instead of being housed far from the mess hall and provided with a bus pass to reach it. Plaintiff also alleges that he was given bus passes to travel to all locations except the work program and commissary; Plaintiff does not indicate whether he needed to travel to the work program for a prison job, how far the commissary was for him, and whether his health prevented him from reaching the commissary without a bus pass.

Plaintiff's allegations are insufficient to state a claim that the Executive Team's policy of limiting bus passes discriminated against disabled prisoners like him without a rational basis, in violation of Plaintiff's right to equal protection of the laws.

2.      Discrimination Based on Race

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). To do so, a plaintiff could (1) point to a law or policy that "expressly classifies persons on the basis of race," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995); (2) identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner, *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); or (3) allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus, *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977).

In some contexts, plaintiffs bringing equal protection claims are required "to plead the existence of a similarly situated group that was treated differently." *Pyke v. Cuomo*, 258 F3d 107, 109 (2d Cir. 2001) (citations and internal quotation marks omitted). However, a plaintiff who "alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of

individuals of a different race in order to establish a claim of denial of equal protection." *Id.* at 110. Instead, plaintiffs must "substantiate their claim that the [challenged action] was motivated by racial discrimination." *Id.*

Here, Plaintiff makes two statements that could be construed as seeking to assert a claim that Dr. Gusman applied a facially neutral policy limiting bus passes in a manner that discriminated based on race. First, Plaintiff alleges that "[t]he[y] stop[ped] issuing permit[s] and told Dr. Fredous not to give out anymore bus passes and only allowed Dr. Gusman to discriminate against mainly black and hispanic prisoners in limiting the bus passes." (*Id.* at 4.) Second, Plaintiff alleges that he saw Dr. Gusman on April 27, 2016, and "[o]n this very date, Dr. Gusman gave [him] another limited buss pass for the use of religious service, law library, visit room and packages. Consequently, I was denied to use the bus pass for work program and commissary, but Dr. Gusman did not treat white hispanic and white prisoners in this same manner. They were allowed to continue on unlimited bus passes, and they were not made to move from the North side to the South side dormitories." (*Id.* at 8.)

Plaintiff does not identify his own race, but the Court assumes for purposes of this order that Plaintiff is black or hispanic. Plaintiff does argue that the new bus policy was applied in a discriminatory manner. But Plaintiff fails to allege sufficient facts to state a plausible claim that Dr. Gusman intentionally discriminated against him based on his race. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face.").

"[I]t is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened *because* the person is a member of that racial group." *See Williams v. Calderoni*, No. 11-CV-3020 (CM), 2012 WL

691832, at *7 (S.D.N.Y. Mar. 1, 2012), *aff'd*, 529 F. App'x 89 (2d Cir. 2013).[6] Here, Plaintiff does not include factual allegations that make it plausible that Dr. Gusman gave Plaintiff bus passes to some locations ("religious service, law library, visit room and packages") but not others ("work program and commissary") *because of* Plaintiff's race.

Plaintiff's allegation that he was moved to a different dormitory and "white hispanic and white prisoners" were "not made to move from the North side to the South side dormitories" also does not provide enough facts to state a claim that other individuals of different races were similarly situated but treated differently because of race. Plaintiff thus fails to plead sufficient facts to state a claim that Dr. Gusman applied the new bus pass policy to him in a racially discriminatory manner.

**B.  Americans with Disabilities Act**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[7] Because Title II of the ADA applies to public entities, any ADA claim against individual defendants in their individual capacities must be dismissed. *See Green v. City of N.Y.*, 465 F.3d 65, 76 (2d Cir. 2006); 42 U.S.C. § 12131(1).

---

[6] Moreover, "[t]he naked assertion by plaintiff that 'race was a motivating factor' without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race is too conclusory to survive a motion to dismiss." *Yusuf v. Vassar College*, 827 F. Supp. 952, 955-56 (S.D.N.Y. 1993), *aff'd in part, rev'd in part on other grounds*, 35 F.3d 709 (2d Cir. 1994).

[7] Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Suits for prospective injunctive relief may, under the doctrine established by *Ex parte Young*, 209 U.S. 123 (1908), proceed against state officers in their official capacities. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003) ("We also cannot embrace the state defendant's statutory claim that an individual sued in his or her official capacity under the doctrine of *Ex parte Young* is not a "public entity" subject to liability under the ADA."). Here, however, any claims for injunctive relief in connection with the bus passes at Otisville are moot because Plaintiff already has been released from DOCCs custody.

Damages are available on an official-capacity claim only to the extent that damages would be available against the State. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Congress unambiguously expressed its intent to abrogate states' immunity from claims for damages under Title II. *See* 42 U.S.C. § 12202. But under section five of the Fourteenth Amendment, Congress has authority to abrogate state immunity only for conduct that violates the Fourteenth Amendment, as well as "a somewhat broader swath of conduct" that is constitutional but which Congress may prohibit in order to remedy or deter actual violations. *Garcia*, 280 F.3d at 108. Thus, claims for damages under Title II of the ADA can proceed only when a plaintiff states a claim for a Fourteenth Amendment violation, *Hilton v. Wright*, 928 F. Supp. 2d 530, 556 (N.D.N.Y. 2013), such as where the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003); *see also Bolmer v. Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010) ("Congress's abrogation of [state agency's] Eleventh Amendment immunity to [plaintiff's] Title II claim is valid if [the agency] violated (1) Title II and (2) [the plaintiff's] right to substantive due process.").

Plaintiff's allegations that Defendants Gerbing, Early, Roberts, and Bennett adopted a new policy to limit bus passes do not suggest that these defendants were motivated by "discriminatory animus or ill will due to disability." *Henrietta D.*, 331 F.3d at 288. Because Plaintiff does not allege conduct that violates the Fourteenth Amendment, Plaintiff cannot pursue a claim under Title II of the ADA for damages. Plaintiff's allegations therefore fail to state a claim under Title II of the ADA.

## C. Due Process in Disciplinary Proceedings

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a [liberty or] property interest is implicated, and if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation omitted).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU [segregated housing unit] confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "[R]estrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009); *Kalwasinski v. Morse*, 201 F.3d 103,107-08 (2d Cir. 1999) (discussing factors relevant to deciding if confinement in SHU constitutes an atypical hardship).

Where a liberty interest is implicated, a prisoner is not entitled to "the full panoply of rights" due in a criminal prosecution but is generally entitled to "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the

disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).

1.     Conflict with Nurse Wolff

Here, Plaintiff alleges that as a result of the disciplinary charges against him at Otisville, he was penalized with 45 days of SHU confinement. (Compl. at 11.) Plaintiff pleads few facts about the conditions of his SHU confinement, which took place in Ulster Correctional Facility: He alleges that he "spen[t] two weeks without any legal property," that he had "limited writing supplies," and that the facility "wanted to take the plaintiff['s] contact lens[es]," though he does not state that they actually took his contact lenses. (*Id.* at 2.) These allegations are insufficient to allege that Plaintiff "endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Arce v. Walker*, 139 F.3d 329, 337 (2d Cir. 1998) (affirming dismissal of claim where the plaintiff asserted that the "depriv[ation] of exercise and access to communal religious services . . . caused him to suffer an 'atypical and significant' hardship"). Plaintiff thus has not adequately alleged that he had a liberty interest entitling him to procedural due process protection at his Otisville disciplinary hearing.

Even if the Court assumes for purposes of this order that Plaintiff had a liberty interest, he fails to plead facts that would demonstrate the process that he received was inadequate. As an initial matter, Plaintiff does not plead facts about the violation with which he was charged. Plaintiff alleges that the hearing officer denied him the opportunity to call Dr. Gusman and Dr. Ferdous; these individuals were involved with Plaintiff's bus pass, but it is not clear how they were involved with the disciplinary charge against Plaintiff. Put another way, if Plaintiff was charged, for example, with disobeying a direct order from Nurse Wolff to sit down (or remain

seated), then the merits of Plaintiff's problems with his bus pass – and Dr. Gusman's testimony – are irrelevant to the disciplinary issue.

Plaintiff's assertion that Deputy Superintendent Bennett could not be an impartial hearing officer because she was involved with Plaintiff's bus pass investigation also fails to state a claim. It is not at all clear from the allegations of the complaint that Plaintiff's disciplinary charge turns on his entitlement to a bus pass and thus involves the same issues as the investigation into his bus pass.

In sum, Plaintiff has not adequately alleged that he had a protected liberty interest or that he was denied a "reasonable opportunity" to call witnesses, denied an impartial hearing officer, or was denied any other process to which he was entitled. For all of these reasons, Plaintiff fails to state a claim under § 1983 for the denial of procedural due process.

2. Conflict with J. Rios

A prisoner "has no constitutional right to be free from being falsely accused in a misbehavior report," *Thomas v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011), and therefore a prisoner's claim that a correction officer filed a false report, without more, is generally not actionable under § 1983, *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). "[F]alse accusations contained in a misbehavior report can rise to the level of a constitutional violation . . . where the false accusation is based on something more, such as retaliation against the prisoner for exercising a constitutional right." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 372 (N.D.N.Y. 2010).

Plaintiff alleges that when he was moved on March 29, 2016, Correction Officer J. Rio "came to get [Plaintiff] in a van. He immediately told [Plaintiff], 'You have too much legal property.'" (*Id.* at 6.) Plaintiff responded that he had a court order allowing him to have six "draft

bags" of legal property. Plaintiff returned to the dorm without his property but several hours later was told to pick up his property; Plaintiff took the bus back to retrieve his property.

The following day, Plaintiff "was called for a misbehavior report[,] where C.O. J. Rio set [Plaintiff] up in retaliation for having legal property." (*Id.* at 6.) Plaintiff was eventually able to demonstrate that Rio did not inventory the property on March 25, 2016; instead, Rio inventoried the property on March 29, 2016, which Plaintiff states (1) violates DOCCS policy on temporary storage; and (2) "prove[s] a set up by C.O. Rio." (*Id.* at 7.) Plaintiff filed a "claim against missing property because the abuse of C.O. J. Rio retaliation against [Plaintiff] speaking out about [Plaintiff's legal property]." (*Id.*)

Plaintiff's allegations do not state a claim that Defendant Rios filed a false misbehavior report in retaliation for Plaintiff's exercise of his constitutional rights. First, Plaintiff has not pleaded any facts about the nature of the disciplinary charge against him.[8] Plaintiff alleges that after Rio investigated Plaintiff's statement that he had a court order for his six bags of legal property, Rio allowed Plaintiff to keep the property. Plaintiff's assertion that Rio retaliated against him for "for having legal property" appears implausible in light of Plaintiff's allegation that Rio called Plaintiff to direct him to retrieve his legal property. Without further allegations, such as information about the disciplinary charges against Plaintiff, for example, Plaintiff does not state a claim that he was retaliated against for "exercising a constitutional right." *Tafari*, 714 F. Supp. 2d at 372.

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects unless it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir.

---

[8] If the disciplinary charge against Plaintiff was for his allegedly inappropriate behavior, for example, the fact that Plaintiff was entitled to the legal property, or that his property should have been inventoried more promptly, is irrelevant to the disciplinary charge.

2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because it is unclear if the defects in Plaintiff's complaint can be cured with an amendment, the Court grants Plaintiff leave to amend his complaint.

**LEAVE TO AMEND**

Plaintiff is granted leave to amend his complaint to detail his claims. In the statement of claim, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant named in the amended complaint. Plaintiff is also directed to provide the addresses for any named defendants. To the greatest extent possible, Plaintiff's amended complaint must:

a) give the names and titles of all relevant persons;

b) describe all relevant events, stating the facts that support Plaintiff's case including what each defendant did or failed to do;

c) give the dates and times of each relevant event or, if not known, the approximate date and time of each relevant event;

d) give the location where each relevant event occurred;

e) describe how each defendant's acts or omissions violated Plaintiff's rights and describe the injuries Plaintiff suffered; and

f) state what relief Plaintiff seeks from the Court, such as money damages, injunctive relief, or declaratory relief.

Essentially, the body of Plaintiff's amended complaint must tell the Court: who violated his federally protected rights; what facts show that his federally protected rights were violated; when such violation occurred; where such violation occurred; and why Plaintiff is entitled to relief. Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wishes to maintain must be included in the amended complaint.

**CONCLUSION**

The Clerk of Court is directed to assign this matter to my docket, mail a copy of this order to Plaintiff, and note service on the docket. Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 17-CV-3520 (LLS). An Amended Civil Rights Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Clerk of Court is directed to docket this as a "written opinion" within the meaning of Section 205(a)(5) of the E-Government Act of 2002.

SO ORDERED.

Dated:    October 15, 2019
              New York, New York

_Louis L. Stanton_
Louis L. Stanton
U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____

Write the full name of each plaintiff.

-against-

_____

_____

_____

_____

Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

_____CV_____

(Include case number if one has been
assigned)

**COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes    ☐ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

## I.   LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other: _____

## II.   PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____

First Name                  Middle Initial               Last Name

_____

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

_____

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

_____

Current Place of Detention

_____

Institutional Address

_____

County, City                          State                    Zip Code

## III.   PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

# IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name               Last Name                        Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 2:

First Name               Last Name                        Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 3:

First Name               Last Name                        Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 4:

First Name               Last Name                        Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

_____

_____

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

_____

_____

## VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.


Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.


| Dated | | Plaintiff's Signature |
|---|---|---|

| First Name | Middle Initial | Last Name |
|---|---|---|

Prison Address

| County, City | State | Zip Code |
|---|---|---|


Date on which I am delivering this complaint to prison authorities for mailing: _____